[Civ. No. 14138. Third Dist. June 17, 1976.]

BETTY ANN BOREN, Plaintiff and Appellant, v.
DEPARTMENT OF EMPLOYMENT DEVELOPMENT et al.,
Defendants and Respondents.

**COUNSEL**

Richard M. Pearl, Charles F. Elsessor, Jr., Robert T. Olmos and Richard A. Paez for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, N. Eugene Hill and Edmund E. White, Deputy Attorneys General, for Defendants and Respondents.

## Opinion

**THE COURT.**\*—Plaintiff, a working wife and mother, was denied unemployment insurance compensation. She charges that the disqualification statute unconstitutionally discriminates against female workers. The statute, section 1264 of the California Unemployment Insurance Code, disqualifies any person leaving his or her job because of marital or domestic duties and who does not supply the family's major support.[1]

The plaintiff is Betty Ann Boren, who worked at a drive-in restaurant. Mrs. Boren had four children, the youngest an infant. Her weekly wage, combined with her husband's earnings, provided the family's support. Her employer required her to change her work shift; she could not find a baby sitter to care for her infant during the proposed new shift; when she told her employer she could not work the new shift, he replaced her.

The unemployment insurance agency rejected Mrs. Boren's claim for unemployment compensation on the ground that she had left her job "for domestic reasons" and was not the major source of family support. After exhausting her administrative appeals, Mrs. Boren filed this action, purportedly as a class suit on behalf of herself and other women. She requested a writ of mandate to compel the unemployment insurance agency to set aside its decision denying compensation and also sought a declaratory judgment of the statute's unconstitutionality. Her thesis was that section 1264, notwithstanding its neutral language, unconstitutionally discriminated against female applicants for unemployment compensation. The superior court sustained the state's demurrer with leave to amend. Plaintiff elected to stand on her pleading. She appeals from the adverse judgment.

---

\*Before Friedman, Acting P. J., and Janes, J.

[1] All statutory references in this opinion, unless otherwise noted, are to the Unemployment Insurance Code. Section 1264 of that code declares: "Notwithstanding any other provision of this division, an employee who leaves his or her employment to be married or to accompany his or her spouse to or join her or him at a place from which it is impractical to commute to such employment or whose marital or domestic duties cause him or her to resign from his or her employment shall not be eligible for unemployment insurance benefits for the duration of the ensuing period of unemployment and until he or she has secured bona fide employment subsequent to the date of such voluntary leaving; provided that, notwithstanding any other provision of this division, this section shall apply only to claims for unemployment compensation benefits and shall not apply to claims for unemployment compensation disability benefits. The provisions of this section shall not be applicable if the individual at the time of such voluntary leaving was and at the time of filing a claim for benefits is the sole or major support of his or her family."

Literally, section 1264 disqualifies an employee who leaves or resigns. Here, Mrs. Boren's employer replaced her when her domestic needs prevented her from accepting a new work shift. She makes no point that she did not actually resign. Counsel on both sides assume that an employee effectively resigns by rejecting the employer's reasonable work conditions. We accept that assumption.[2]

Like other state systems, the California unemployment insurance program is designed primarily for those who are unemployed because of lack of work and who are genuinely in the labor market. Section 100 describes the system as one providing benefits for persons unemployed "through no fault of their own." The primary focus on economically caused unemployment is expressed by provisions disqualifying an applicant who left his work "voluntarily without good cause" or had been "discharged for misconduct connected with his most recent work." (§ 1256; see, however, *Prescod* v. *Unemployment Ins. Appeals Bd.* (1976) 57 Cal.App.3d 29, 40 [127 Cal.Rptr. 540].) The system's restriction to claimants genuinely in the labor market is implemented by confining eligibility to the claimant "able to work and available for work for that week" and who has "conducted a search for suitable work in accordance with specific and reasonable instructions of a public employment office." (§ 1253, subds. (c), (e).)

Section 1264, the provision under attack, imposes a disqualification resembling that for voluntary terminations without good cause. It denies eligibility to a supplementary breadwinner who leaves in order to marry or to join a distant spouse or who quits because of "marital or domestic duties." An important feature of section 1264 perpetuates the disqualification throughout the ensuing period of unemployment and until the individual has secured a new job. The statute is framed in neuter terms, applying literally to men and women alike.

In challenge to the statute's surface avoidance of gender references, Mrs. Boren's petition alleges: "Due to cultural role patterns and a past history of discrimination women in our society bear a disproportionate share of the domestic duties and are significantly less able to contribute

---

[2]Section 1264 refers variously to an individual "who leaves his or her employment," to one whose marital or domestic duties cause the individual to "resign" and to the individual who was the major breadwinner "at the time of such voluntary leaving." The Unemployment Insurance Appeals Board has concluded that these three phrases are synonymous. (*In the Matter of Sherry M. Pratt*, Precedent Benefit Decision No. P-B-131, dated Feb. 24, 1972.)

to the support of their families than their male counterparts. Thus the disqualification from provisions of . . . § 1264 operates almost solely against women, as evidenced by the fact that in 1971 ninety-nine percent (99%) of the claimants declared ineligible for unemployment insurance under § 1264 were women."

The state's demurrer provisionally admits the plaintiff's factual claims. Thus for the purpose of this decision, we accept the truth of the allegation that 99 percent of the persons disqualified under section 1264 in 1971 were women. In the absence of challenge by the state, it is justifiable to assume that the 1971 statistic also characterizes later years.[3]

At oral argument we inquired whether the unemployment insurance agency construed section 1264 to disqualify a pregnant woman who left her job because she did not wish to work during the remaining months of her pregnancy. The answer was affirmative. The Unemployment Insurance Appeals Board holds that the "domestic duties" clause of section 1264 applies to a woman who leaves her work because of pregnancy. (*Matter of Sherry Pratt, supra;* see, however, § 1264.2.)

Appellant charges section 1264 with a number of constitutional infirmities—that it classifies unemployment insurance applicants by sex, thus colliding with title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and offending the supremacy clause of the federal Constitution; that it denies female claimants equal protection of the laws and due process of law in violation of the Fourteenth Amendment. The statute does indeed deprive affected claimants of equal protection of the laws. Other claims of invalidity need not be analyzed.

■ The equal protection clause of the Fourteenth Amendment denies the states the power to erect arbitrary statutory classifications based upon sex. (*Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251].) ■ According to California decisional law, a statute establishing "suspect classifications" or trenching upon "fundamental interests" is vulnerable to strict judicial scrutiny; it may be sustained by a showing of a compelling state interest which necessitates

---

[3]An exhibit attached to the petition displays statistics attributed to the Research Division of the Department of Human Resources Development (since re-named Department of Employment Development). In 1971, section 1264 supplied the basis for rejection of 15,749 claims, 99 percent of which had been filed by females. Projected into 1972, this statistic forecast 15,500 denials, 99.5 percent of them affecting female applicants. The state does not gainsay these statistics.

the distinction; a sex-based classification is treated as suspect. (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16-20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; see also *Frontiero* v. *Richardson* (1973) 411 U.S. 677, 682-683 [36 L.Ed.2d 583, 589-590, 93 S.Ct. 1764] (plurality opn.).) We are of course bound by the established California rule.

The state argues that section 1264 is devoid of any gender classification; that it affects male and female employees alike; that it draws a line only between those who remain at work and those who leave their jobs for domestic reasons; that social and cultural patterns, not the statute, force women rather than men to leave work for the sake of domestic needs; that any inferiority of treatment arises from these social patterns, not from the statute. Moreover, according to the argument, the unemployment insurance system is designed primarily for those unemployed through lack of work; the Legislature may reinforce that objective by withholding subsidies from those who resign to take care of their families.

Contrary to the state's thesis, section 1264 does not draw a line between those who remain at work and those who leave work for domestic reasons. Instead, it draws a line between several kinds of unemployment insurance claimants. It draws a line between a claimant who left work voluntarily for domestic reasons and one who left work voluntarily but for good cause of another sort.[4] The former is barred from compensation, the latter eligible.

Section 1264 creates a second classification, differentiating between persons providing primary and secondary family support. Even though the individual quit work for domestic reasons, the primary breadwinner is immune from the statutory bar, the secondary breadwinner vulnerable to it.

Finally, the statute establishes a third classification, expressed in terms of the disqualification's duration. A person who quits voluntarily but for good cause must nevertheless pass the test of "able and available for

---

[1]See *Perales* v. *Department of Human Resources Dev.* (1973) 32 Cal.App.3d 332, 336-337 [108 Cal.Rptr. 167]. Under California law legitimate personal reasons may supply good cause for a voluntary resignation, thus warding off the "voluntary quit" disqualification. See *Syrek* v. *California Unemployment Insurance Appeals Board* (1960) 54 Cal.2d 519, 529 [7 Cal.Rptr. 97, 354 P.2d 625]; *Bunny's Waffle Shop* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 735, 743 [151 P.2d 224]; *Prescod* v. *Unemployment Ins. Appeals Bd.*, *supra*, 57 Cal.App.3d at pages 40-41.

work" during any week for which he seeks benefits. (§ 1253.) A person disqualified under section 1264 is not restored to eligibility upon returning to the labor market, for section 1264 prolongs the disqualification until the person regains bona fide employment.

■ In measuring these classifications against the equal protection clause, the court deals not so much with the statute's neutral language as with its practical impact. Its ultimate effect is the criterion of equal treatment. (*Reitman* v. *Mulkey* (1967) 387 U.S. 369, 373 [18 L.Ed.2d 830, 833, 87 S.Ct. 1627]; *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 534 [50 Cal.Rptr. 881, 413 P.2d 825].) The courts must inquire into the statute's actual purposes. (*Weinberger* v. *Wiesenfeld* (1975) 420 U.S. 636, 648 [43 L.Ed.2d 514, 524-525, 95 S.Ct. 1225].) Discrimination may be demonstrated by statistics showing the statute's actual operation. (See *Hernandez* v. *Texas* (1954) 347 U.S. 475 [98 L.Ed. 866, 74 S.Ct. 667]; *Chance* v. *Board of Examiners* (2d Cir. 1972) 458 F.2d 1167.) ■ A seemingly neutral statute which actually disqualifies a disproportionate number of one sex is discriminatory and vulnerable to the strict scrutiny test; it is enough if statistics show that the standard affects women only. (*Hardy* v. *Stumpf* (1974) 37 Cal.App.3d 958, 962, 964 [112 Cal.Rptr. 739].)

The parties correctly appraise the cultural-social conditions which cast working wives, rather than working husbands, in the role of secondary breadwinners; which impel working wives, rather than working husbands, to leave work for family reasons. "Obviously, the notion that men are more likely than women to be the primary supporters of their spouses and children is not entirely without empirical support." (*Weinberger* v. *Wiesenfeld, supra,* 420 U.S. at p. 645 [43 L.Ed.2d at p. 523].) According to the 1975 Handbook On Women Workers,[5] the proportion of married women in the labor force rose from 15 percent in 1940 to 43 percent in 1974 (p. 17). In 1974 working couples represented about two-fifths of all married couples in the population; of the 20.4 million married women in the labor force in 1974, about 18.8 million had husbands who were also in the labor force. (*Id.,* p. 22.) Of mothers with children under 18, 13.6 million, or 46 percent, were in the 1974 labor force. (*Id.,* p. 25.) An inverse trend accompanies increased feminine participation in the nation's work force. Median earnings of women were 63 percent of median earnings of men in 1956, but only 57 percent of men's earnings in 1973. (*Id.,* p. 131.) Wives who worked year-round,

[5]Bulletin 297, United States Department of Labor, Employment Standards Administration, Women's Bureau.

full-time in 1973 had earnings which accounted for 38 percent of family income. (*Id.,* p. 139.) Obversely, the husbands of working wives contributed 62 percent of family income. As a general rule then, husbands are the primary breadwinners, working wives the secondary breadwinners.

Note should be taken of employed women who do not have working husbands. About 6.6 million families (12 percent of all American families) were headed by women in 1973. (*Id.,* pp. 139-140.) Obviously there are some families in which the woman's earnings supply the sole or major support.

Commentators describe related demographic developments, such as the trend toward smaller families, a shortened reproductive span for women and intensifying demand for women workers. (Law and the American Future (Schwartz, edit., The American Assembly, 1976) pp. 58-59; Hayghe, *Families and the Rights of Working Wives—an Overview,* Monthly Lab. Rev. (May 1976) pp. 12, 14.) Nevertheless, certain traditional modes survive. We take judicial notice, as a matter of common knowledge, that women are more likely than men to follow their spouses to a new job location, more likely to quit work to care for young children or an ill family member. Sheer economic need perpetuates vestigial tradition—the family can better afford to dispense with the earnings of the lesser-paid wife than those of the higher-paid husband.

■ Contrary to the state's argument, it is the statute, not these social patterns, which centers its adverse effect upon female claimants for unemployment insurance. The social patterns long antedated the statute, which originated in 1953. The statute's effect was obvious to its authors. Its disqualification would fall primarily and almost exclusively upon working wives. To argue that it was not designed to accomplish its obvious result is unrealistic. Section 1264 was designed to disqualify a selected group of female claimants.

That section 1264 does not disqualify all females who leave work for domestic reasons does not dilute the sexual basis of the classification. A female who is the head of the family and primary provider of its support is immune from the disqualification. Section 1264 divides claimants into two groups—members of both sexes who provide primary family support and females who provide secondary support. Members of the first group

who leave jobs for domestic reasons are ineligible only while their domestic needs keep them off the labor market. Members of the second group, essentially entirely female, are not restored to eligibility by return to the labor market; rather, the statute prolongs their ineligibility until they have secured new employment. Section 1264 imposes an augmented penalty when familial needs (as contrasted with other kinds of good cause) impel a working wife's job termination.

The intended effect of section 1264 is the disqualification of a group of female claimants and the prolongation of their disqualification past that of other claimants. Because it establishes a sex-based disqualification, the statute is inherently suspect as a denial of equal protection. It may be sustained only by a showing of its necessity for the fulfillment of a compelling state interest.

Section 1264 is vulnerable to strict scrutiny for the added reason that it trenches upon fundamental liberties. In the formulation of state unemployment insurance systems, the states are not free to establish disqualifications which deprive persons of constitutionally protected rights. (See, for example, *Turner* v. *Dept. of Employment Security* (1975) 423 U.S. 44 [46 L.Ed.2d 181, 96 S.Ct. 249]; *Sherbert* v. *Verner* (1963) 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790].) ■ Freedom of personal choice in matters of marriage and family life is one of the liberties protected by the due process clause of the Fourteenth Amendment. (*Cleveland Board of Education* v. *LaFleur* (1974) 414 U.S. 632, 639 [39 L.Ed.2d 52, 60, 94 S.Ct. 791].) For example, a conclusive presumption of incapacity for employment imposed upon a pregnant woman for a fixed period before and after childbirth interferes with a basic human liberty; the state must achieve legitimate state ends through more individualized means when basic human liberties are at stake; the conclusive presumption unduly penalizes the exercise of a basic liberty and denies due process. (*Turner* v. *Dept. of Employment Security, supra,* 423 U.S. at pp. 46-47 [46 L.Ed.2d at p. 184]; *Cleveland Board of Education* v. *LaFleur, supra,* 414 U.S. at pp. 644-646 [39 L.Ed.2d at pp. 62-63].)

■ Section 1264 of the California Unemployment Insurance Code similarly impinges upon constitutionally protected interests. An employed woman's decision to marry, to follow her husband to another locality or to leave work for childbirth or child care, falls within the ambit of Fourteenth Amendment liberties. Because familial circumstances supply the motivation for her job termination, section 1264 treats her differently than claimants who have quit for other kinds of good

cause[6] or who are not "able and available" for other reasons. The latter become eligible by remaining in the labor market or returning to it. Section 1264 imposes a harsher penalty, prolonging the claimant's disqualification until she finds a new job. The statute thus discriminates against women who leave their jobs for domestic reasons as compared with those who leave their jobs for other kinds of good cause. The statute trenches upon personal choices concerning marriage and family life. For this reason too, it is subject to strict scrutiny.

We have examined our conclusion in the light of two federal Supreme Court decisions. The first, *Geduldig* v. *Aiello* (1974) 417 U.S. 484 [41 L.Ed.2d 256, 94 S.Ct. 2485], sustained the exclusion of pregnancy as a compensable disability under a state disability unemployment insurance system. A majority of the court held that the exclusion was only a choice of compensable disabilities, not an exclusion of females; that the state had a legitimate interest in maintaining the self-supporting character of its disability program. In contrast is *Weinberger* v. *Wiesenfeld, supra,* 420 U.S. 636, invalidating a provision of the Social Security Act which granted survivors' benefits to widows but denied them to widowers. The court held that the classification was gender-based and "entirely irrational." (420 U.S. at p. 651 [43 L.Ed.2d at pp. 526-527].)

Suffice it to say that neither decision tested the statute by the strict scrutiny and compelling interest criteria required by California law. (*Sail'er Inn* v. *Kirby, supra.*)

█ In support of the statutory classification, the state demonstrates some legitimate policy choices but no compelling governmental interest. Section 1264 cannot be viewed as a means of preventing subsidies to women who are occupied with family care. So long as family necessities keep the claimant off the labor market, she is disqualified by the "able and available" requirement of section 1253.

The statute serves to aid the unemployment insurance system's focus on economically caused unemployment. It doubtless reduces expenditures of unemployment insurance funds. As we have observed, the system does not bar certain other claimants whose unemployment stems

---

[6]An example is presented by the female claimant in *Prescod* v. *Unemployment Ins. Appeals Bd., supra,* 57 Cal.App.3d 39. Having left her work voluntarily but for good cause of a nondomestic sort, she possessed or regained eligibility by being "able and available" for a new job. Had family needs been her motive for quitting, she would have remained ineligible for benefits throughout the ensuing period of unemployment.

from noneconomic causes. (See fn. 4, *ante.*) A state may not preserve the fiscal integrity of its programs by invidious distinctions between classes of citizens. (*Shapiro* v. *Thompson* (1969) 394 U.S. 618, 633 [22 L.Ed.2d 600, 614, 89 S.Ct. 1322].) When a statutory classification is subject to strict scrutiny, the state must do more than show that the exclusion saves money. (*Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250, 263 [39 L.Ed.2d 306, 317-318, 94 S.Ct. 1076].) No compelling state interest protects section 1264 from invalidity as a denial of equal protection. The statute is a nullity.

The trial court erred in sustaining the state's general demurrer. Whatever may have been plaintiff's ability and availability for work during the period for which she sought benefits, she was entitled to a judgment nullifying the disqualification imposed under section 1264 and declaring that statute's nullity. The parties have not debated, nor do we decide, whether the action may be maintained as a representative suit.

The judgment is reversed and the cause remanded to the trial court with a direction to enter a judgment for plaintiff consistent with this opinion.