REYNOSO, J.
I dissent. The trial court erred in granting judgment on the pleadings. It thereby effectively denied plaintiffs’ requested injunctive and declaratory relief without the type of evidentiary hearing required. The trial court and the majority, however, reach the merits. On the limited record available on appeal I disagree with the majority’s holding on the merits. Accordingly, I dissent as to the entire opinion.

*596
Procedural Posture

The majority ignore the procedural posture of this case. The entire cause should have gone forward so that we could have had the benefit of a full record. Courts have recognized that constitutional issues like those raised in this case should not be reviewed on appeal on the basis of a limited record. (See D’Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 13-14 [112 Cal.Rptr. 786, 520 P.2d 10].) It is inexpedient to decide constitutional issues on motion to dismiss because “the production of evidence may well make the answer to these questions more clear.” (Guerrero v. Schmidt (W.D.Wis. 1973) 352 F.Supp. 789, 792.) This is so because the courts must review evidence upon which stereotyped generalizations involving suspect classifications are based. (See Hardy v. Stumpf (1974) 37 Cal.App.3d 958, 962 [112 Cal.Rptr. 739].)
On appeal, facts alleged by plaintiffs’ complaint must be accepted as true. (Kachig v. Boothe (1971) 22 Cal.App.3d 626, 630 [99 Cal.Rptr. 393].) Since plaintiffs raised constitutional issues in the court below, including triable issues of fact, I consider their rejection without an evidentiary hearing to be reversible error. Nevertheless, since the trial court and the majority have reached the constitutional issues I consider them on the record as we find them.
I am unconvinced by the majority’s equal protection holding. First, it summarily rejects the “compelling state interest” test. Second, it analyzes and then reasons that under the “rational basis test” the statute is constitutional. On this imperfect record I conclude that the legislative classification is not rationally related to a legitimate state interest. And, unlike the majority, I conclude that the proper standard is that of compelling state interest. The state legislation appears to fail constitutional muster pursuant to either test.
A
Plaintiffs have carried their burden under the rational basis test. Classifications challenged under the equal protection clauses of the California and federal Constitutions must be “rationally related” to a legitimate state interest. (See U.S. Dept. of Agriculture v. Moreno (1973) 413 U.S. 528, 533 [37 L.Ed.2d 782, 794, 93 S.Ct. 2821]; In re Kapperman (1974) 11 Cal.3d 542, 545 [114 Cal.Rptr. 97, 522 P.2d 657].)
*597 1. Government Code Section 1029 Is Unconstitutional on Its Face
The majority is convinced that the legitimate state purpose behind the ex-felon classification is to (1) assure the “good character and integrity” of peace officers, and (2) avoid in peace officers any appearance of untrustworthiness in the public’s eyes. The argument is initially engaging until the statute under attack is examined with care. Government Code section 1029, subdivision (a) bans ex-felons from all “peace officer” positions designated in the statute. The statutory definition of “peace officer,” found in Penal Code section 830 et seq. however, includes the most novel and unexpected public positions and even some private positions. (See Pen. Code, § 830 et seq.) Further, it does not include some we would expect to find.
Originally, peace officer status was limited to four very similar, police-type occupations: sheriff, police, marshal and constable. “Peace officers are Sheriffs of Counties, and Constables, Marshals, and Policemen, of cities and towns respectively.” (Stats. 1851, ch. 29, § 110, p. 224; see also Revised Laws of the State of California; Pen. Code (1871) § 817, p. 283.) Subsequent amendments have drastically increased its scope to over 100 tenuously related positions (see Pen. Code, § 830 et seq.). Included are the expected—the policemen; but also included are probation officers who have much more limited power and even furniture and bedding inspectors who have yet less power.
Included are employees who exercise no significant police powers at all. For example, California Horse Racing Board and Department of Health Investigators are defined as peace officers. Horse racing investigators are never armed, made no arrests over a 12-month period, and were seldom assaulted. (Cal. Leg., Sen. Com. on Judiciary, subcom. on Peace Officers (Nov. 9, 1976) pp. 78-79 (memorandum from Cal. Horse Racing Bd.).) Health investigators are precluded from carrying firearms (see Pen. Code, § 830.3, subd. (p)), make no arrests, issue no citations, and have never been assaulted. (Ibid., at pp. 90-95 (testimony of Gerry Rohlfes, Chief of Investigations Section, Department of Health).)
On the other hand, employees who can make felony arrests on probable cause are not included. Thus, food and agricultural inspectors are not defined as peace officers. Yet their authority is as broad as that of a peace officer in making arrests.
*598 Finally, the statute includes, as peace officers, persons who are not government employees. Employees of private entities, such as policemen for railroad and steamboat companies and designated personnel of private cemeteries (Pen. Code, § 830.4, subds. (a)(8) and (a)(9)) respectively, are included.
While the connection between private employees of a private cemetery and a cop on the beat may be tenuous, the majority consider the inclusion of such disparate groups a mere legislative decision protected from constitutional attack. It points to De Veau v. Braisted (1960) 363 U.S. 144 [4 L.Ed.2d 1109, 80 S.Ct. 1146] as authority. Not only did the United States Supreme Court sustain the constitutionality of a New York statute banning ex-felons from certain positions, but it commented on the numerous federal and state statutes disqualifying ex-felons from holding public office.
The majority misses the mark. First, the statute in De Veau was a narrowly written, specific prohibition with a clear purpose in mind. The exclusion was not absolute. There, the State of New York had passed a statute prohibiting the agents of unions from soliciting, collecting or receiving any “dues, assessments, levies, fines or contributions” from “pier superintendents, hiring agents, longshoremen and port watchmen” on behalf of any labor organization representing any such employees if any officer of the concerned union was an ex-felon. However, if the ex-felon had been pardoned by the Governor “or other appropriate authority” or had received a “certificate of good conduct” from the parole board, then the disability would be removed. The United States Supreme Court looked to the extensive hearings which showed that for years the New York waterfront presented a “notoriously serious situation.” It cited mounting abuses and the “skulduggeries” of the longshoremen’s union. The employee positions cited by the statute were those particularly subject to corruption and to pressures. That was De Veau. On the other hand, we deal with a statute that covers over 100 positions, including a broad range of employees; the statute is an absolute bar to employment permitting no administrative discretion; and no specific evil which applies to each and every position covered by statute is easily recognizable.
The contrast between De Veau and the case at bench can more readily be assessed if we focus on the two state purposes which the majority finds legitimate: (1) to assure good character and (2) to avoid the appearance of untrustworthiness.

*599
Good Character and Integrity

The notion that conviction of a felony constitutes “a disqualifying defect in moral character” which justifies permanent exclusion from an occupation found favor among courts in times past (Hirsch v. City & County of San Francisco (1956) 143 Cal.App.2d 313, 325 [300 P.2d 177]). That notion has long since been discredited. (Perrine v. Municipal Court (1971) 5 Cal.3d 656, 663 [97 Cal.Rptr. 320, 488 P.2d 648]; see Morrison v. State Board of Education (1969) 1 Cal.3d 214, 227-228 [82 Cal.Rptr. 175, 461 P.2d 375].) The present requirement is that at least some reasonable relation between an applicant’s qualification and his past criminal conviction be shown.[1] (See Perrine v. Municipal Court, supra, at p. 663.)
We come to Government Code section 1029. What reasonable relationship is there between prior felony conviction showing a lack of good moral character and the total exclusion of an ex-felon from each of the many included positions? I find none. The state’s approach is irrational in its overbroad ban. The purpose may well be legitimate for policemen and other truly similar occupations. However, without an extensive showing of job-relatedness, the statute must be deemed grossly over inclusive.

Public Trust and Confidence

Intertwined with the issue of good moral character is that of public trust and confidence. The majority has “no problem” in extending this rationale to any peace officer-related occupation. However, the extension is not as problem free as the majority would believe. The enforcement role of a policeman is at variance with most of the other peace officer-designated positions found in the statute.
*600 There is no logical connection among the many positions covered. The connection, one would expect, would be the power of arrest. Not so. The peace officer does have the power of arrest. (Pen. Code, §§ 830.1, 830.3, subds. (a), (b), (e) and 836.) However, other positions included are given powers of arrest only in very restricted basis. Thus, some have no arrest powers except with regard to escaping prisoners or under such declared emergencies as are necessary to carry out the duties of the job. (Pen. Code, § 830.5.) In fact, few of the positions included have the “broad power of arrest” which we associate with policemen.
How is the public trust and confidence in a law enforcement agency enhanced by the exclusion or inclusion of ex-felons as furniture or agricultural inspectors? The mere status of the statutorily defined peace officer is not rationally related to a matter of public trust because of the over-inclusive (and under-inclusive) nature of the categories. Those who normally do not arrest, as well as those who do arrest, are included. Those who are public officers, as well as those who are not public officers, are included. Unlike the majority, I find a “real problem” in extending the public trust and confidence argument to each and every one of the positions covered by section 1029.
No mystery surrounds extension of the traditional definition of peace officer to such an unrecognizable degree by the Legislature. The Legislature must respond to the interests of various groups. Correctional officers, for example, were granted the status of “peace officers” in order that they may obtain better group insurance benefits. (See Pen. Code, § 830.5, subd. (d).) That is, because peace officers appear to have enjoyed better benefits in times past, many employee groups, even tangentially associated with the role of peace officers, have persuaded the Legislature to include them within the term “peace officer.” This may have had the salutory effect of providing some benefit for more groups. It has had a deletorious effect of banning ex-felons from a great many positions which only a most imaginative Legislature could categorize as “peace officers.” Such a reason does not suffice in light of this constitutional attack. The statute, I conclude, is unconstitutional on its face.
2. Section 1029 Is Unconstitutional as Applied
Section 1029 is unconstitutional as applied to plaintiff Hetherington.[2] He has been barred from the positions of parole agent I, group supervisor *601 and youth counselor. I note that it is the State Personnel Board which made the final determination that ex-felons are ineligible for these three positions. It is possible that the board’s decision merely constitutes an abuse of discretion since the statute does not specifically state which job titles come under the ban. However, for the purpose of this dissent, I assume that the board’s interpretation is consistent with the meaning of the statute.
None of the governmental interests mentioned by the majority provides a rational basis for the total exclusion of all ex-felons from these positions. First, ex-felons as a class have not been prohibited from working in the correctional field in the federal system, or in the majority of the states. (See Priestino & Allen, The Parole Officer Aide Program in Ohio: Exemplary Project, Ohio State Univ., Program For the Study of Crime and Delinquency, Monograph No. 42 (1975) at p. 25.) California, by its adoption of section 1029, subdivision (b) has conceded that it can guard against the possibility that a person without good moral character can be hired. By that amendment the statute permits the hiring of a pardoned ex-felon who has demonstrated ability to “assist persons in programs of rehabilitation” and to be employed “as a parole officer of the Department of Corrections.” Second, the asserted interest that police officers carry firearms is inapplicable to Youth Authority personnel who are neither required nor allowed to carry firearms. (See Youth Personnel Rehabilitation Service Manual, § 123.3.) The state, of course, has more than adequate screening procedures to assure that the persons hired have none of the debilitating characteristics and all of the affirmative characteristics required of persons in those positions. (See Gov. Code, § 1031; Declaration of Allen Breed, Director of the Cal. Youth Authority.)
The majority decision ignores these real factors. It merely refers to the solicitous attitudes of the courts regarding the character of peace officers who deal with juvenile delinquents. I would agree with the implication that such officers must be exemplary in character in order to “inculcate and foster respect for parental, school and other legal authority.” (Johnson v. County of Santa Clara (1973) 31 Cal.App.3d 26, 34 [106 Cal.Rptr. 862].) However, to a youth who has broken the law, an ex-felon, particularly a person like Hetherington, can be exemplary in the most meaningful sense. He can demonstrate to troubled youth that they can succeed in changing their lifestyles and constructively channel their efforts. (See Declaration of Allen Breed, supra, at p. 161.) Plaintiff Hetherington is able to relate to the problems of the Youth Authority client population; he has a sympathetic, yet objective, understanding of *602 the problems of delinquent youth. (See Declaration of Allen Breed, supra, at p. 161; see also, Declaration of plaintiff Hetherington, at p. 170.)
Hetherington, the record shows, has lived an exemplary life for a decade. During that time he has obtained a certificate of rehabilitation, supported his family, and has been gainfully employed. His work record has been outstanding. Importantly, it has been a work performed for the California Youth Authority. That attests to his good moral character and his capacity.
Finally, I note the custodial nature of the Youth Authority positions under discussion. While those positions are given the status of “peace officers” they are essentially restricted to exercising authority over prisoners. (Pen. Code, § 830.5.) Other custodial officers perform comparable work and yet are not designated as peace officers. (Pen. Code, § 831.)
B
Government Code section 1029 fails to meet the compelling state interest test.
As did the majority, I have considered plaintiffs’ cause pursuant to the rational basis test. .Nonetheless, in my view, the majority applied an erroneous test. It is the strict scrutiny test which is appropriately applied to plaintiffs’ attack on section 1029. The reasons are three-fold: First, we deal with a fundamental interest, the right to gainful employment; second, we deal with a suspect classification, that of ex-felons; and third, the state lacks compelling interest in the total exclusion of ex-felons from all section 1029 defined peace officer-related positions.
1. The Fundamental Right to Employment
The California Supreme Court has characterized employment as a fundamental interest under the California Constitution.
The majority reject plaintiffs’ fundamental interest assertion on the authority of D’Amico v. Board of Medical Examiners, supra, 11 Cal.3d 1. However, the D’Amico court dealt with the issue of whether the strict scrutiny test ought to apply to the licensing of practitioners in the healing *603 arts. The Supreme Court reasoned that the rational basis test should apply. Its explanation of the rational basis test, as applied in D’Amico and the strict scrutiny test as applied in Sail’er Inn, Inc. v. Kirby (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]), brings the case at bench squarely within the strict scrutiny rationale. Three reasons persuaded the court that the healing arts profession should be removed from the fundamental interest found in employment. First, D’Amico did not deal with a “suspect classification.” As I discuss later, we do deal with such a classification in considering ex-felons. Second, D’Amico did not deal with “common occupations.” Many of the positions included within section 1029 are of that category. Third, the court reasoned that the case of San Antonio School District v. Rodriquez (1973) 411 U.S. 1, 33 [36 L.Ed.2d 16, 42-43, 93 S.Ct. 1278], restricted a “fundamental interest” to those matters “explicitly or implicitly guaranteed by the Constitution.” There, the Supreme Court suggested that only a total deprivation of a state given right (education) would violate the United States Constitution. In D’Amico there was no deprivation of such a right. In the case at bench, we do have an absolute ban and thus we deal with a constitutionally guaranteed right. Further, in no way did the California Supreme Court withdraw from its notion that an interest may be “independently viable” under the state Constitution. (Serrano v. Priest (1976) 18 Cal.3d 728, 765 [135 Cal.Rptr. 345, 557 P.2d 929].) Here, such an independently viable interest is present.
In the context of section 1029 the reasoning of Sail’er Inn is intact. The court stated: “We have held that the state may not arbitrarily foreclose any person’s right to pursue an otherwise lawful occupation. . . . The right to work and the concomitant opportunity to achieve economic security and stability are essential to the pursuit of life, liberty and happiness.” (Sail’er Inn, Inc. v. Kirby, 5 Cal.3d at p. 17.) Since a fundamental right was at stake in Sail’er Inn the court added: “[t]he strict scrutiny standard of review ... [is applicable] because the statute limits the fundamental right of one class of persons to pursue a lawful profession. . . .” (Sail’er Inn, Inc. v. Kirby, supra, at p. 17.)
As in Sail’er Inn we deal with a right to employment respecting some common occupations. We deal with a group which historically has been discriminated against. Finally, we deal with an interest which is “implicitly” guaranteed by the Constitution. Thus, with respect to the applicable constitutional test, it is Sail’er Inn and not D’Amico which applies.
*604 2. The Class of Ex-felons Constitutes a Suspect Classification
The majority rule that ex-felons do not fall within any suspect classification. Although the United States Supreme Court may have adopted “strict and rigid definitions of fundamental rights and suspect classes” (see Massachusetts Bd. of Retirement v. Murgia (1976) 427 U.S. 307 [49 L.Ed.2d 520, 96 S.Ct. 2562]), the California Supreme Court, in interpreting the California Constitution, has not been so constrained. (See Serrano v. Priest, supra, 18 Cal.3d 728; Sail’er Inn, Inc. v. Kirby, supra, 5 Cal.3d 1; see also, Cal. Const, art. I, § 24, as amended in 1974 (“Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution”).)
The California Supreme Court has specified two factors in determining whether a class is suspect. They are (1) immutable traits tied to outdated social stereotypes and (2) the stigma of inferiority and second class citizenship. (Sail’er Inn, Inc., v. Kirby, supra, at pp. 18-20.) These factors apply to ex-felons.
The status of ex-felon is immutable. It is true that prior felony conviction is not a status created by the accident of birth as are sex or race. (See Sail’er Inn, supra, at p. 18 and cases cited.) Nonetheless, it is more “immutable” a trait than other suspect classifications, alienage (see Purdy & Fitzpatrick v. State of California (1969) 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]) or poverty (see Serrano v. Priest (1971) 5 Cal.3d 584, 604 [96 Cal.Rptr. 601, 487 P.2d 1241]; In re Antazo (1970) 3 Cal.3d 100, 112 [89 Cal.Rptr. 255, 473 P.2d 999].)
An alien is a person who travels or lives in this country but is not a citizen. Alienage can be terminated by acquiring citizenship. In contrast, the classification of prior felony conviction, once imposed, becomes far more immutable. Even after a full pardon, the criminal record persists (Pen. Code, § 4852.17), and does so even if the pertinent penal statute has been abolished (see Pen. Code, § 11100 et seq.). Poverty, of course, can be changed by acquiring wealth.
The crucial distinction is that a whole class is “relegated to an inferior legal status without regard to the capabilities or characteristics of its individual members.” (Sail’er Inn, Inc., supra, at p. 18.) Those “characteristic[s] frequently bear[ ] no relation to ability to perform or contribute to society. . . . Where the relation between characteristic and evil to be prevented is so tenuous, courts must look closely at classifications based *605 on that characteristic lest outdated social stereotypes result in invidious laws or practices.” (Id., at p. 18.)
There are over 120,000 ex-felons in California who continue to face severe unemployment problems. The national unemployment rate for ex-felons is traditionally at least three times the rate for the general public. (See Chaneles, The Open Prison, Monograph (U.S. Dept. of Labor); see also, Miller, The Closed Door: The Effects of a Criminal Record on Employment with State and Local Public Agencies (1972).) Removing several hundred thousand job possibilities manifestly has a deleterious effect.
The persistence of stereotypical notions in the denial of any opportunity to compete for statutorily defined peace officer-related jobs is especially debilitating for ex-felons due to the stigma attached to their status. One commentator has noted that “convicted felons have for centuries faced purposeful unequal treatment.” (Comment, The Revolving Door: The Effect of Employment Discrimination Against Ex-Prisoners, 26 Hastings L.J. 1403, 1420.) They are branded as second-class citizens due to civil disability statutes which deny them the right to vote, to serve as a juror, or to hold public office. (Elec. Code, § 701; see Otsuka v. Hite (1966) 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412]; Code Civ. Proc., § 199; Gov. Code, § 1021; see also, Cal. Const., art. XX, § 11.) The stigmatization experienced by ex-felons as a class is compounded by the fact that “the great majority of prisoners are poor, lower class, members of minority groups, and uneducated.” (Comment: The Revolving Door: The Effect of Employment Discrimination Against Ex-Prisoners, supra, at p. 1421.) Minorities account for over 50 percent of all felons in California state prisons even though they constitute only 26 percent of the total population of the State of California. (See State of Cal., Health and Welfare Agency, Dept. of Corrections, Characteristics of Felon Population in Cal. State Prisons by Institution (June 30, 1975) dated Aug. 15, 1976; U.S. Dept. of Commerce, Bureau of the Census 1970 Census Rep.—Detailed Characteristics—Cal. Section 1, tables 139 and 140.)
The majority reject any claim of disproportionate impact, stating that a “statutorily significant percentage correlation or relationship” must first be established. The statistics show that the ratio of minority felons to the minority population is three times as great as the ratio of nonminority *606 felons to the nonminority population.[3] An absolute ban against ex-felons reduces the employment opportunities for the minority community resulting in a disproportionate economic and social impact. (See Boren v. Department of Employment Dev. (1976) 59 Cal.App.3d 250, 257 [130 Cal.Rptr. 683].) Courts are concerned with the practical impact of a statute, not its neutral language. The rejection of plaintiffs’ claims on the ground that the statistics failed to reach a “statutorily significant” level was improper.[4]
In summary, the factors identified by the court in Sail’er Inn apply to ex-felons. The “immutable” status of prior felony conviction, which persists for the rest of a person’s life, is the result of outdated social stereotyping based on a “disqualifying defect in moral character.” The class is also stigmatized by society and assigned to a position of inferiority and second class citizenship. This stigmatization is compounded by the minority and indigent status of most ex-felons. I would hold that the class of ex-felons constitutes a suspect classification in the context of equal employment opportunities.
3. The State Has No Compelling Interest
I proceed to the final step under an equal protection analysis. “Under this standard the presumption of constitutionality normally attaching to state legislative classifications falls away, and the state must shoulder the burden of establishing that the classification in question is necessaiy to achieve a compelling state interest.” (Serrano v. Priest, supra, 18 Cal.3d at p. 768. See also, Sail'er Inn, Inc. v. Kirby, supra, 5 Cal.3d at pp. 16-17; Westbrook v. Mihaly (1970) 2 Cal.3d 765, 785 [87 Cal.Rptr. 839, 471 P.2d 487].)
*607 Penal Code section 830 et seq. define “peace officer” but not by specific occupational titles. Government Code section 1029, of course, incorporates those definitions. A number of state interests are advanced—the good moral character of peace officers, public trust and confidence in law enforcement officials and the carrying of firearms. We have seen that these interests cannot and do not apply to each affected position.
Even if a compelling interest were established, defendants have not shown that the automatic ex-felon bar is necessary to further the state’s purpose. That is, that it is the least obtrusive means to meet that interest. (See Dunn v. Blumstein (1972) 405 U.S. 330, 342-343 [31 L.Ed.2d"274, 284-285, 92 S.Ct. 995].) The state, in my view, has a viable screening alternative through the individualized consideration of ex-felon applications for those positions deemed particularly important to the public interest. (See Gov. Code, § 1031, subd. (a).)
I would reverse and remand for a full evidentiary hearing. The constitutional issues posed demand no less. Nonetheless, even this incomplete record convinces me of the unconstitutionality of Government Code section 1029.
A petition for a rehearing was denied August 1, 1978, and appellants’ petition for a hearing by the Supreme Court was denied November 2, 1978. Bird, C. J., did not participate therein. Kaus, J.,* participated therein. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.

Legislative enactments have followed a parallel course. Thus, by the 1971 amendment to Government Code section 1031 the Legislature eliminated consideration of “good moral character,” standing alone, as a prerequisite to employment in those occupations having the power and authority of peace officers. Rather, the determination of moral character is now based on a “thorough background investigation.” Government Code section 1029 includes within its prohibition both the legally declared peace officers (Pen. Code, § 830 et seq.) and those who have the “power and duties of peace officer,” but who are not statutorily defined as peace officers.
Another recent change in the law is found in Business and Professions Code section 480 et seq. Those sections, dealing with denial, suspension and revocation of licenses, were amended in 1964 to eliminate the “good moral character” phrases as to a prerequisite to qualifying for regulated licenses. Section 480, subdivision (b) specifically states that a license may not be refused “solely on the basis that he [the applicant] has been convicted of a crime if he has obtained a certificate of rehabilitation.”

The absence of an evidentiary hearing is particularly serious in an analysis of a statute as applied. For purposes of this section I assume the truth of plaintiffs’ factual allegations.

The 1970 Census report shows a total population of 19,957,304 for the State of California. The minority figure is 5,202,747. Of the total felon population in California correctional institutions and on parole for which a racial analysis is possible more than 50 percent are minority. A comparison of the racial composition of the approximately 120,000 ex-felon population to the total population of the state results in a 3-1 ratio.

Again we suffer from a limited record. Necessary data was under the control of defendants and was properly requested by interrogatory. Plaintiffs’ interrogatory described peace officer-related positions and requested “the number of individuals presently employed in each position or classification who are (a) Black; (b) Spanishsurnamed; (c) Asian-American; or (d) American Indian.” After the motion for summary judgment on the pleadings had been filed, the parties agreed by stipulation to permit the postponement of answers. Plaintiffs may have been able to prove a broader discriminatory impact if defendants’ responses showed that minorities as a whole were disproportionately excluded from peace officer-related positions. Such discriminatory practices in general could then be used to show racial discrimination through the total exclusion of ex-felons who are disproportionately minorities.

Assigned by Acting Chairperson of the Judicial Council.