[No. S000269. Jan. 4, 1988.]

ALTAVILLE DRUG STORE, INC., et al., Plaintiffs and Respondents, v.
EMPLOYMENT DEVELOPMENT DEPARTMENT et al., Defendants and Appellants.

**COUNSEL**

John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, Elisabeth C. Brandt and Barbara Haukedalen, Deputy Attorneys General, for Defendants and Appellant.

McDonough, Holland & Allen and Michael B. Arkin for Plaintiffs and Respondents.

OPINION

**PANELLI, J.**—This case involves Unemployment Insurance Code section 1032, which sets forth circumstances in which benefits awarded to a claimant are not charged to the reserve account of the employer.[1]  ██  Specifically, we must decide whether section 1032 was intended by the Legislature to operate in connection with section 1256 (eligibility for benefits) so that a later expansion of the word "spouse" in section 1256 mandates use of the same expanded definition in the application of section 1032. We conclude that it does.

## I. FACTS AND PROCEDURAL HISTORY

On December 29, 1983, Belinda Dillard (claimant) resigned voluntarily from employment with respondent Altaville Drug Store, Inc., for the purpose of marrying and moving to Sacramento with her new husband. Claimant was married the next day, December 30, 1983, and moved as planned to Sacramento, a distance of about 70 miles from Altaville.

Claimant applied to appellant Employment Development Department (EDD) for unemployment insurance benefits. The EDD granted benefits pursuant to section 1256[2] and charged Altaville Drug's reserve account for the benefits paid and payable to claimant.

Altaville Drug appealed the EDD's decision. In a hearing before an administrative law judge (ALJ), Altaville Drug conceded that claimant had good cause to quit and was therefore eligible under section 1256 for unemployment benefits, but argued that under section 1032, the cost of her benefits should not be charged to the employer's reserve account.[3] The ALJ

---

[1] All further statutory references are to the Unemployment Insurance Code unless otherwise indicated.

[2] Section 1256 governs eligibility for unemployment benefits and provides in pertinent part: "An individual is disqualified for unemployment compensation benefits if the director finds that he or she left his or her most recent work voluntarily without good cause or that he or she has been discharged for misconduct connected with his or her most recent work. . . . [¶] An individual may be deemed to have left his or her most recent work with good cause if he or she leaves employment to accompany his or her spouse to a place from which it is impractical to commute to the employment. . . ."

[3] Section 1032 provides in pertinent part: "If it is ruled under Section 1030 or 1328 that the claimant left the employer's employ voluntarily and without good cause or was discharged by reason of misconduct connected with his or her work . . . or that he or she left the employer's employ to accompany his or her spouse to or join her or him at a place from which it is impractical to commute to such employment, to which a transfer of the claimant of the employer is not available, and at which the spouse has secured employment, benefits paid to the claimant subsequent to the termination of employment due to such voluntary leaving or

agreed that claimant's resignation to marry and join her husband at a new residence constituted "good cause" to quit under section 1256 by virtue of the expansive definition of "spouse" provided in the administrative regulations and uncodified statutes. Nonetheless, the ALJ ruled that Altaville Drug's reserve account would not be relieved of charges because such relief is available under section 1032 only to employers whose employees are married at the time they quit. Although both code sections contain the same express language, the ALJ refused to read into section 1032 the same expansive definition of "spouse" applied in section 1256. The Unemployment Insurance Appeals Board affirmed, and Altaville Drug filed a petition for writ of mandate in the superior court.

The superior court issued the writ. It reasoned that section 1032 is a correlative provision to section 1256 and that the term "spouse," which for purposes of section 1256 has been expanded to include "imminent spouse," has the same meaning for purposes of section 1032. The court directed EDD to relieve Altaville Drug's reserve account of charges for claimant's unemployment benefits.

The Court of Appeal reversed, and we granted Altaville Drug's petition for review.

## II. DISCUSSION

Unemployment benefits are paid from a pooled fund contributed to by all employers. The EDD maintains a separate reserve account for each employer. (§ 1026, subd. (a).) Generally, benefits paid to an unemployed individual from the pooled fund are charged to the reserve account of the individual's former employer. (§ 1026, subd. (b).) The rate of an employer's contribution to the fund is based upon the ratio between its average base payroll and the net balance in its reserve account. (§ 977.) A decision awarding benefits to a claimant that are chargeable to the reserve account of the claimant's employer has the effect of increasing the employer's rate of contributions to the fund. (See *Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 776 [163 Cal.Rptr. 619, 608 P.2d 707].)

Section 1032 sets forth certain circumstances in which benefits awarded to a claimant are not charged to the reserve account of the employer. If

discharge . . . or due to the termination of employment caused by such leaving to accompany or join a spouse, which are based upon wages earned from such employer prior to the date of such termination of employment, shall not be charged to the account of such employer, except as provided by Section 1026, unless he or she failed to furnish the information specified in Section 1030 within the time limit prescribed in that section or unless such ruling is reversed by a reconsidered ruling."

these circumstances exist, benefits are paid out of the pooled fund and the charge is allocated to the account of every employer.

The focal point of the instant case is the meaning of the word "spouse" as used in sections 1032 (exceptions to reserve account charges) and 1256 (eligibility for benefits). The Court of Appeal reasoned that the statutory language is clear and unambiguous, and that resort to statutory construction was therefore unwarranted. (*West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 850 [226 Cal.Rptr. 132, 718 P.2d 119].) Petitioner, on the other hand, notes that a literal interpretation of the words of a statute should not prevail if it creates a result contrary to the apparent intention of the Legislature. (*People* v. *Ali* (1967) 66 Cal.2d 277, 280 [57 Cal.Rptr. 348, 424 P.2d 932].) We conclude that the Court of Appeal erred in its analysis.

A.  *Development of Sections 1032 and 1256.*

Prior to 1977, there existed in section 1264 a rule of eligibility for unemployment insurance compensation which was known as the "domestic quit" rule. That section in essence provided that no unemployment benefits would be payable to an employee who voluntarily resigned from his or her employment to follow his or her spouse to another location which made a commute to the prior place of employment impractical. In 1977 the Legislature repealed the "domestic quit" rule after *Borer* v. *Dept. of Employment Dev.* (1976) 59 Cal.App.3d 250 [130 Cal.Rptr. 683] held that the rule unconstitutionally discriminated against female workers. By repealing section 1264, the Legislature permitted section 1256 to embody tacitly the philosophy that as a matter of public policy, a "domestic quit" should be considered good cause for quitting. Section 1256 at that time (1977) simply permitted the payment of unemployment benefits to employees who quit work for "good cause."

In 1979, the Legislature considered the corollary issue—the effect on the employer of the change it had just made in the domestic quit rule. It concluded that no single employer should bear the entire cost of such a change in the rule. Instead, the cost should be shared equally by all employers. The mechanism chosen to accomplish this goal was through the "employers pool" wherein the cost was borne by all employers. This intent was codified by an amendment to section 1032.

The intent behind the amendment of section 1032 is stated in a legislative committee report as follows: "Since the elimination of the 'domestic quit' rule in 1977, several employers have been upset at having female employees quit for reasons totally unconnected with the job (i.e., to move with their

husbands) and having their experience-rated UI taxes increased because of such quits. It feels fundamentally unjust to these employers to have their UI taxes increased for reasons totally beyond their control. There is a Balancing Account tax, to which all employers contribute equally instead of on an experience-rated basis, which could be charged with the 'domestic quits' rather than charging the experience-rated accounts of individual employers . . . . [¶] This bill seeks to shift the cost of this one kind of 'domestic quit' from individual employers' accounts to the balancing account. Another way of understanding this is that it would 'socialize' the cost of 'domestic quits.' That is, all employers would absorb the cost of 'domestic quits' equally; the individual employer who happened to be the victim of a 'domestic quit' would not be penalized by it." (Assem. Finance, Insurance and Commerce Com., Analysis of Assem. Bill No. 134 (1979-1980 Reg. Sess.) as amended Mar. 12, 1979; hereafter referred to as the 1979 Committee Report.) Thus, the Legislature intended section 1032 to be the corollary of section 1256; the sections are in pari materia.[4]

In 1980, the EDD adopted section 1256-12 of title 22 of the California Code of Regulation, recognizing for the first time "prospective" as well as "existing" marital status as a domestic obligation that might impel a claimant to leave work for good cause. Expressly included was the situation where the claimant's "prospective marriage is imminent and involves a relocation to another area because the claimant's future spouse has established or intends to establish his or her home there, and it is impossible or impractical for the claimant to commute to work from the other area." (Cal. Code Regs., tit. 22, § 1256-12, subd. (b)(1).)

In 1982 the Legislature amended section 1256 to state expressly that a "domestic quit" to move with a "spouse" constituted good cause. (Stats. 1982, ch. 1073, § 1.) An uncodified provision of the 1982 amendment states that the "amendment to Section 1256 . . . is intended . . . to endorse the policy of the Employment Development Department, as expressed in its regulations, which distinguishes persons who are married *or whose marriage is imminent* from others in determining whether a person has left his or her most recent work without good cause when he or she leaves employment to accompany another person to a place from which it is impractical to commute to that employment."[5] (Stats. 1982, ch. 1073, § 13, pp. 3873-3874,

---

[4]Pari materia is defined in Black's Law Dictionary (5th ed. 1981) at page 1004: "Of the same matter; on the same subject; as, laws pari materia must be construed with reference to each other."

[5]Additionally, the uncodified provision states that the amendment to section 1256 "is intended to restore the law as it was construed prior to the decision by the First District of the California Court of Appeal in Norman v. Unemployment Insurance Appeals Board." In *Norman* the appellate court had held that an employee who quit her job to join her fiance who

italics added.) We embraced section 1256's expansive definition of "spouse" in both *Norman* v. *Unemployment Ins. Appeals Bd., supra,* 34 Cal.3d 1 and *MacGregor* v. *Unemployment Ins. Appeals Bd.* (1984) 37 Cal.3d 205 [207 Cal.Rptr. 823, 689 P.2d 453].

B. *The Court of Appeal Approach.*

The Court of Appeal agreed that section 1256 has an expansive definition of "spouse," but it refused to apply the same expansive definition to section 1032. The court reasoned that the language of section 1032 was clear on its face, that "spouse" has a clear, unambiguous meaning, and that no statutory construction was necessary. Further, the Court of Appeal noted that the 1982 amendment to section 1256—expressly stating that "domestic quits" constitute good cause and expanding "spouse" to include "imminent spouse"—did not specifically mention section 1032. The court concluded the omission was intentional: "We presume the Legislature was cognizant of the interrelationship of sections 1256 and 1032 and would have added a reference to the latter section as it easily could have done had it intended the definitions of 'spouse' to coincide."

The Court of Appeal also stated that, even assuming the statutes were in pari materia, an implied amendment of section 1032 by an express amendment of section 1256 would be inferred only if there were no reasonable basis for harmonizing the former with the latter as amended. (*Lambert* v. *Conrad* (1960) 185 Cal.App.2d 85, 95 [8 Cal.Rptr. 56] disapproved on another point in *Johnson & Johnson* v. *Superior Court* (1985) 38 Cal.3d 243, 255, fn. 7 [211 Cal.Rptr. 517, 695 P.2d 1085].) The court suggested there was a reasonable basis for distinguishing between the word "spouse" as used in the two sections. The Court of Appeal noted that the only real policing of unemployment insurance claims is done by the employer whose reserve account is to be taxed, as only that employer has a financial incentive to investigate. Verification of one's status as an actual spouse is simple and generally beyond dispute, but the same cannot be said of "imminent spouses." Hence, the Court of Appeal concluded that the Legislature may have intended employers to scrutinize claims made by imminent spouses through charges to the employer's reserve account whereas such scrutiny would be unnecessary in the case of an actual spouse.

---

had secured employment in another state had "good cause" to terminate her employment notwithstanding that marriage was not imminently contemplated. We granted hearing and held that Norman had not established "good cause" for her voluntary departure from employment since she had not demonstrated the imminency of her marriage. (*Norman* v. *Unemployment Ins. Appeals Bd.* (1983) 34 Cal.3d 1, 9 [192 Cal.Rptr. 134, 663 P.2d 904].)

## C. *Analysis*

We believe that the Court of Appeal erred in its analysis. Although section 1032 standing alone appears unambiguous, the word "spouse" as used in section 1032 is not clear on its face in light of the expanded definition of the same word in section 1256. Given this ambiguity, statutory construction of section 1032 is appropriate. (*Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].)

█ The fundamental rule of statutory construction is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) Statements of legislative committees pertaining to the purpose of legislation are presumed to express the legislative intent of statutes as enacted. (*Palmer* v. *Agee* (1978) 87 Cal.App.3d 377, 384 [150 Cal.Rptr. 841].) █ In the case at bar, the only expressed legislative intent is evidenced in the 1979 Committee Report.[6] Although not expressly stating that sections 1256 and 1032 are in pari materia, the 1979 Committee Report clearly indicates that sections 1256 and 1032 operate together.

As noted in the 1979 Committee Report, the purpose of the 1979 amendment to section 1032 was to remedy the unfair situation imposed on an employer of a "domestic quit" whose employee left work with good cause to follow his or her spouse. The situation is similarly unfair when an employee leaves with good cause to follow an "imminent spouse." Thus, the purpose of the 1979 amendment is furthered by giving the word "spouse" parallel meanings in sections 1032 and 1256. Since the issue of "fairness" is the only legislatively expressed purpose behind the 1979 amendment to section 1032, we conclude that a similar expanded definition of "spouse" in section 1032 is mandated.

### III. CONCLUSION

The judgment of the Court of Appeal is reversed and the case remanded with instructions to affirm the judgment of the trial court.

Lucas, C. J., Mosk, J., Broussard, J., Arguelles, J., and Kaufman, J., concurred.

---

[6] The EDD, in its answer, submits two letters from the California Taxpayers Association to Assemblyman Imbrecht, chairman of the committee reviewing the 1979 amendment to section 1032. These letters do not constitute evidence of legislative intent. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699-701 [170 Cal.Rptr. 817, 621 P.2d 856].) Moreover, the letters refer only to the 1979 legislation and thus say nothing about the question before us—the effect of the 1982 amendment to section 1256 on section 1032.

**EAGLESON, J.**—I respectfully dissent. I would affirm the decision of the Court of Appeal.

The majority ignores the plain language of section 1032.[1] Section 1032 refers to "spouse," not to "imminent spouse." Courts will give effect to a statute according to the natural and ordinary meaning of the words used in the statute. (*West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 850 [226 Cal.Rptr. 132].) In natural and ordinary usage, "spouse" means a person's wife or husband. (Webster's New Internat. Dict. (3d ed. 1961) p. 2208.) "When *statutory* language is clear and unambiguous there is no need for construction, and courts should not indulge in it." (*West Covina Hospital, supra,* at p. 850 (italics added); *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658 [147 Cal.Rptr. 359, 580 P.2d 1155].) To paraphrase Anthony Trollope's often-quoted observation, a spouse is a spouse, and it is worse than useless to say that it is something else. (Trollope, The West Indies and the Spanish Main (1859) p. 123.) The majority, on its own initiative and without the need to do so, interprets section 1032 so as to redefine the plainly understood word "spouse" to include "imminent spouse."

Section 1032 was in existence in its present form, in all respects material here, in 1982 when the Legislature amended section 1256 and stated in an uncodified portion of the amendment that spouses and "imminent spouses" should be treated differently from other persons for purposes of section 1256. (Stats. 1982, ch. 1073, § 13, p. 3873.) The majority assumes that, *if* the Legislature had considered the relationship between sections 1032 and 1256, it *would have* amended section 1032 in 1982 to comport with the majority's interpretation of that section. I disagree with the majority's assumption. There are three possible reasons why section 1032 was not amended in 1982: ¶ (1) The Legislature did not consider the effect on section 1032 of the amendment to section 1256. If that is the case, the majority opinion imputes to the Legislature a nonexistent intent.

(2) The Legislature did consider section 1032 and decided not to amend it. If that is what occurred, the majority opinion is contrary to legislative intent.

(3) The Legislature intended to amend section 1032 but inadvertently failed to do so. If so, the Legislature can easily clarify its intent. This court should not usurp the Legislature's function.

---

[1] All statutory references are to the Unemployment Insurance Code.

If sections 1032 and 1256 are as closely related as the majority believes they are, one must assume that the Legislature *was* aware of that relationship and would have made a corresponding amendment to section 1032 in 1982 if the Legislature had intended the two sections to coincide. The Legislature declined another opportunity to adopt the majority's view in 1983 when it amended section 1032 in a respect not material here. (Stats. 1983, ch. 1169, § 4, p. 4438.) " '[F]ailure to make changes in a given statute in a particular respect when the subject is before the Legislature, and changes are made in other respects, is indicative of an intention to leave the law unchanged in that respect.' " (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 65 [81 Cal.Rptr. 465, 460 P.2d 137].) Similarly, the selective silence of the Legislature is significant in tending to show that it had a different intent as to each section. (*People* v. *Drake* (1977) 19 Cal.3d 749, 755 [139 Cal.Rptr. 720, 566 P.2d 622].) If the difference between sections 1032 and 1256 is not what the Legislature intended, it can eliminate the difference. What need is there for us to do so?

The majority concludes that sections 1032 and 1256 are in pari materia and that the Legislature's express amendment in 1982 of section 1256 was an amendment by implication of section 1032. This reasoning violates two established rules of statutory construction. First, "[t]here is no rule of law that necessarily requires the same meaning to be given to the same word used in different places in the same statute." (*Sunset Tel. and Tel. Co.* v. *Pasadena* (1911) 161 Cal. 265, 275 [118 P. 796].) "Spouse" need not mean the same thing in section 1032 as it does in section 1256.

Second, even with statutes in pari materia, courts have long been reluctant to find an implied amendment of one statute by the express amendment of another. A court can find an implied amendment only when there is no reasonable basis for harmonizing the former statute with the latter statute as amended. (*People* v. *Leong Fook* (1928) 206 Cal. 64, 69-70 [273 P. 779].) The Court of Appeal found a reasonable basis for harmonizing sections 1032 and 1256. In distributing among all employers the cost of benefits paid to employees who leave employment to accompany their spouses, the Legislature may have considered this circumstance more easily verifiable and thus less susceptible to fraudulent or otherwise invalid claims than other types of so-called domestic quits, e.g., a quit to join an "imminent spouse." In the latter instance, the Legislature may have considered it more effective to continue the employer's incentive to monitor such claims. The majority acknowledges the Court of Appeal's reasoning on this point but declines to explain how the reasoning is flawed.

I believe there is another, equally reasonable basis on which to harmonize sections 1032 and 1256. The fact that all persons who leave employment to

join their "imminent spouses" may be entitled to benefits under section 1256 does not mean that all employers should share in subsidizing those benefits by having them charged to the pooled fund. For various demographic reasons, some employers may be more likely than others to have employees who quit and move to marry. For example, it appears to be a demographic fact that certain types of employers tend to employ relatively young employees. A fast food restaurant comes to mind. Other employers, for example, a senior citizens workshop, may employ persons who are likely to be older and statistically less likely to be facing an "imminent" marriage, especially one combined with a long-distance move that would require a change of employment. The Legislature apparently determined that each employer should bear the reserve account charges for its employees who quit for "imminent" marriages because it would be unfair to charge those costs to the pooled fund and thus increase the cost to employers who seldom or never have employees quit for "imminent" marriages.

The majority's opinion is a well-meaning effort to resolve what the majority deems to be a statutory inconsistency. I am not persuaded there is one, but, if there is, the Legislature should resolve it. The effect of the majority's decision is to substitute this court's judgment for that of the Legislature.