[No. A058214. First Dist., Div. Three. June 17, 1994.]

CHARLES GOODMAN, Plaintiff, Cross-defendant and Appellant, v. JOAN GOODMAN ZIMMERMAN et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

## COUNSEL

Bernard N. Wolf, Foreman & Brasso, Ronald D. Foreman, Charles J. Miller, Lewis & Lewis and Marvin K. Lewis for Plaintiff, Cross-defendant and Appellant.

Coblentz, Cahen, McCabe & Breyer, William K. Coblentz, Charles R. Breyer, Virginia A. Crisp, Cooley, Godward, Castro, Huddleson & Tatum and James A. Richman for Defendants, Cross-complainants and Appellants.

## OPINION

## MERRILL, J.—

I

### FACTUAL AND PROCEDURAL BACKGROUND

Edward Goodman, founder of Goodman Lumber Company (GLC), died on September 2, 1990. Edward left most of his approximately $100-million-value estate to his two daughters, Joan Zimmerman and Gloria Clumeck.[1] Edward left his son, Charles Goodman, one-third of an antique automobile collection, a bequest valued at approximately $2 million. Charles filed a complaint seeking the imposition of a constructive trust and revocation of trust amendments and a petition for revocation of probate alleging, inter alia, that his father lacked testamentary capacity because he suffered from a mental disorder within the meaning of Probate Code[2] section 6100.5, subdivision (a)(2). Specifically, Charles sought to establish that Edward suffered from depression with psychotic features that emanated from a paranoid personality disorder. He endeavored to prove that Edward had an encapsulated delusion pertaining to Charles, i.e., a delusion relating only to Charles.

---

[1]For ease of reference we will refer to the parties by their first names.
[2]All further statutory references are to the Probate Code.

Additionally, Charles filed a complaint upon a rejected creditor's claim. At the conclusion of the presentation of his case at trial, Charles dismissed with prejudice all claims based upon the rejected creditor's claim with the exception of his claim of alleged oral promises to make certain testamentary dispositions to him. The three actions were consolidated, and after the dismissal of various causes of action, the issues remaining before the trial court for decision, other than those raised in the cross-complaint, were the alleged breach of oral promises to make testamentary dispositions and the question of testamentary capacity. Joan and Gloria were named as defendants individually, and Joan was named as a defendant in her representative capacities as executor and trustee.

Edward founded GLC in 1949 and it became one of the nation's most successful building supply businesses. He transferred ownership of the company to a family limited partnership in 1983. The partnership was also referred to as GLC. According to Edward's plan, Charles's company, Charles Goodman, Inc., was the general partner of the partnership. The limited partners were as follows: Charles, with a 40 percent interest; and Joan, Gloria and the Goodman 1981 revocable trust, each with a 20 percent interest.

In addition, Edward established a corporation known as Discount Builders Supply (DBS) and each of the three children received a 33⅓ percent interest in this company. DBS operated a retail store but GLC handled all the purchasing, payroll, accounting and other administration for DBS.

When Edward became less involved in the business in the mid-1970's he placed Charles in charge of the daily operations of GLC as its chief executive officer. Charles also served as the general manager of DBS.

Edward continued to make all principal financial decisions for GLC. At the year-end meeting, Edward decided how the company's profits would be distributed. Through 1988, Edward decided the salary for Charles and himself, the employee bonuses, the profit sharing plan contributions, the charitable contributions and the amount of the company's rent. Edward set Charles's annual compensation from GLC and DBS for 1986 through 1989 at $1 million or more. Edward also determined the extent to which each of his children and their families would receive nonsalary benefits from GLC. Joan and Gloria were not invited to the year-end meetings as Edward did not want their participation in financial decisions.

A cross-complaint filed by Joan and Gloria against Charles and Charles Goodman, Inc., alleged that Charles breached the partnership agreement and

the fiduciary obligations imposed upon him as general partner. The partnership agreement provided, inter alia, that the general partner shall not possess partnership property for other than a partnership purpose and that employee salaries must be reasonable. Joan and Gloria contended that the salary and bonuses Charles received from 1985 through 1990 were grossly disproportionate to the value of the services performed by him, and that he used partnership money, employees, and materials for his own personal use.

The trial court granted judgment in favor of Joan and Gloria individually and Joan in her representative capacities, and against Charles on all three actions filed by him, and in favor of Charles and against Joan and Gloria on the cross-complaint filed by them.

Charles has appealed from the judgment entered against him, but he has limited his appeal to the matter of testamentary capacity. Joan and Gloria have appealed from that portion of the judgment which denies them relief on their cross-complaint.[3]

The evidence showed that Edward was a very strong-willed, opinionated, decisive man. He became angry if someone crossed him. At various times each of the children was in and out of his favor. Marion Goodman, mother of Charles, Joan and Gloria and Edward's wife of 42 years, died in 1982. During her lifetime, Marion had been able to soothe tensions among the children. Edward was very concerned that upon her passing the family would fall apart. Family harmony was important to Edward.

Edward was upset to learn that Charles and his wife, Barbara, had mistreated Joan during the 1984 Hawaii family vacation. Joan had written Edward a letter following that vacation citing specific instances of mistreatment. Edward showed the letter to several people, including Charles who made no effort to resolve the issue with Joan. Edward also asked Gloria, the eldest child, to do something about the family disharmony. Gloria set up a meeting with all family members and a close family friend, Edward's doctor, Martin Brotman, who was aware of the problems. When Charles said he would not attend, the meeting was cancelled.

Subsequently there was a brief period during which Joan and Edward did not communicate. During this time Gloria also fell out of Edward's favor

---

[3]Charles also filed a cross-complaint alleging breach of fiduciary obligations by his sisters and seeking imposition of a constructive trust and declaratory relief in the event Joan and Gloria were successful on their cross-complaint. The trial court denied Charles any relief on his cross-complaint as it was rendered moot by the ruling on the cross-complaint filed by Joan and Gloria.

In the unpublished portion of this opinion we find that the trial court did not err in denying Joan and Gloria relief on their cross-complaint.

when she refused Edward's request to sell him her interest in GLC. Edward responded by substantially reducing Gloria's share in his estate plan. About this same time Edward denied Joan any participation in the activities of GLC. Joan and Gloria did not attend the 1985 Hawaii vacation. Ultimately Joan and Edward reconciled and it was anticipated that the 1986 Hawaii family vacation would provide an opportunity for reconciliation among the family members. There was evidence that during the trip, Barbara refused to help Joan in her attempt to reconcile with Charles, that Barbara appeared to snub Joan and her husband, Gary, by walking in and abruptly out of a room in which they were present, that Edward cancelled a dinner date with Joan and Gary because Charles and Barbara did not want to go to dinner with them, and that Charles and Barbara were not pleasant to Joan and Gary and did not spend time with them. Edward was angry with Charles because of his behavior during the trip and told several of his friends about his dissatisfaction. He told his attorney, Richard Greene, that Charles "did not do what he should have done." He also told Charles that he was upset.

In 1987, Edward brought Joan back into the family business. Shortly thereafter, at Edward's apartment, Barbara and Edward became involved in a heated argument. The housekeeper testified that Edward and Barbara screamed at each other about the business. Edward told her that she and Charles could not run his business. Edward later described the confrontation to Gary, stating that Barbara should not tell him how to divide up his company. He stated that he was putting Joan back into the business because he was unhappy with the way Charles and Barbara had treated her in Hawaii.

Charles went to Edward's apartment in November 1989 for a meeting. A heated argument ensued when Charles questioned his removal as trustee of Edward's trust. Edward said he removed him because he was secretive and untrustworthy. The confrontation took place approximately 10 months before Edward's death. Charles did not speak to his father again after that meeting.

In January 1990, Edward informed his attorney, Richard Greene, that he wanted to change his estate plan so that Charles would receive one-third of the antique car collection and that the remainder of the estate would go to his daughters. Greene was also Charles's attorney and friend. He stalled in the preparation of the documents because of his concern about the changes Edward wanted to make to his estate plan. Ultimately a new will and trust amendment was executed on May 22, 1990, with the changes Edward had specified. Greene was named trustee as he had been in prior trusts.

Edward hired new counsel when he learned that among the documents he signed was a document giving Greene power of attorney. On May 31, 1990,

Philip Hudner, head of the estate planning group at Pillsbury, Madison & Sutro, George Montgomery, another Pillsbury attorney, and Frederick Makinney, a notary public, went to Edward's apartment where he executed a new trust amendment removing Greene as trustee. Edward did not change the disposition of his estate with respect to Charles.

Hudner testified that Edward appeared to be thinking normally, was alert, understood the questions put to him, and responded in an articulate manner. Makinney also described Edward as articulate and completely in control of his faculties.

Hudner sought to verify Edward's intent with respect to the disproportionate gift to Charles. Hudner prepared a detailed memorandum in respect to the meeting with Edward, including, verbatim, portions of his conversation. Edward told Hudner that his relationship with Charles was "bad" and had been so for four or five years, and that Charles did not speak to his sisters or to him. He also criticized Charles's managerial skills, stating he was doing a terrible job of managing the company, was absent at critical periods, and did not have good people around him. When Hudner pointed out that the new will and trust amendment gave Charles only a one-third share of the antique car collection, Edward responded that he had already done enough for his son. He noted that he had already given Charles a 40 percent share of the company, a $1 million salary plus bonuses, and real estate valued in the many millions of dollars. Charles's share of the profits was twice as large as that of each of his sister's. Edward also mentioned that his eight grandchildren, including the three children of Charles and Barbara, had already received a one-half interest in property worth $20 million.

When Hudner suggested a $1 million gift to Charles, Edward responded that it would mean nothing to his son. Edward again cited all he had done for Charles apart from the trust. He criticized his son's excessively affluent life-style and stated he was spoiled. Hudner concluded Edward was not ambivalent about what Charles should receive from his estate.

Evidence at trial showed that Charles's net worth was between $12 million and $21 million.

## II

### Charles's Appeal

Charles contends that (1) the trial court failed to apply the correct statutory standard for lack of testamentary capacity as set forth in section 6100.5,

subdivision (a)(2), and (2) even if it is determined that the trial court did apply this statutory standard, substantial evidence does not support the judgment. He submits the trial court's ruling would be an abuse of discretion on the facts under the correct legal standard. It is unclear as to the particular issue being raised by this latter contention but Charles explains that the basis of this challenge is that none of his father's ostensible reasons for disinheriting him can withstand reasonable scrutiny. Further, he states that "the evidence indicates that Edward was suffering from an encapsulated delusion: a delusion restricted to a particular subject matter, namely Charles."

The relevant portion of section 6100.5, subdivision (a), provides: "An individual is not mentally competent to make a will if at the time of making the will either of the following is true: [¶] . . . [¶] (2) The individual suffers from a mental disorder with symptoms including delusions or hallucinations, which delusions or hallucinations result in the individual's devising property in a way which, except for the existence of the delusions or hallucinations, the individual would not have done." In support of his contention that the trial court appplied an incorrect statutory standard, Charles submits that in reaching its decision the court "applied a restrictive definition of delusion, based on a series of legal decisions which substantially pre-date the enactment of [section 6100.5, subdivision (a)(2)]," and in its statement of decision "employed the term 'insane delusion': a term which is found nowhere in the statute and which does not even exist in the lexicon of modern psychiatry." Charles maintains that the trial court's use of the term "insane delusion" in the statement of decision and its reliance upon prestatutory case law was erroneous. We disagree and conclude that Charles has misconstrued the trial court's analysis.

■ We first consider Charles's contention that the trial court failed to apply the statutory standard for lack of testamentary capacity as set forth in section 6100.5, subdivision (a)(2). Charles's argument that the trial court relied upon outdated "insane delusion" terminology in concluding Edward did not lack testamentary capacity is simply not borne out by the record. The court clearly was applying the statute in its decision. We think Charles reads too much into the fact that the trial court makes reference to "insane delusion" on several occasions in the statement of decision. These references were to the terminology used by the courts prior to the enactment of the statute. The essence of the trial court's ruling is found in its statement that "none of Edward's beliefs about Charles meet the definition of a delusion, i.e., a false or mistaken belief about the existence of a fact. Further, the Court finds that even if these beliefs were false or mistaken, there was evidence which supported these beliefs and therefore the Court concludes that Edward was not suffering from a delusional mental disorder as defined

in Probate Code section 6100.5 (a)(2)." The trial court found that evidence supported Edward's beliefs about Charles's treatment of his sisters and his belief about the way Charles ran the business.

■ We find no error in the trial court's citation to prestatutory case law for the principle that even if one's beliefs are inaccurate, a mistaken belief does not justify overturning a will where there is any evidence supporting the belief. (See *Estate of Struve* (1929) 100 Cal.App. 255, 260 [279 P. 846]; *Estate of Shay* (1925) 196 Cal. 355, 361 [237 P. 1079].) To the extent that the language of section 6100.5 presents any ambiguity with respect to delusions and the level of proof required, we find the statute was basically tracking the law as applied in California prior to its enactment. The fundamental rule of statutory construction is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. Statements of legislative committees pertaining to the purpose of the legislation are presumed to express the legislative intent of statutes as enacted. (*Altaville Drug Store, Inc.* v. *Employment Development Department* (1988) 44 Cal.3d 231, 238 [242 Cal.Rptr. 732, 746 P.2d 871].) ■ Moreover, there is a presumption that a statute does not, by implication, repeal the common law. Unless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules. (*People* v. *Zikorus* (1983) 150 Cal.App.3d 324, 330 [197 Cal.Rptr. 509].) "A statute will be construed in light of common law decisions, unless its language ' "clearly and unequivocally discloses an intention to depart from, alter, or abrogate the common-law rule concerning a particular subject matter . . . ." [Citations.]' [Citation.]" (*People* v. *Zikorus, supra*, at p. 330.) We should also recognize that there will always be some variation in the language used by the courts to define a common law rule. It is the rule itself which is important, not the fact that the courts may describe it in somewhat different terms from time to time.

With these principles in mind, we look to the legislative history of section 6100.5. On February 14, 1985, Senator Nicholas Petris, acting upon the proposal of an attorney, introduced Senate Bill No. 421. The original version of the bill provided that "there is a rebuttable presumption affecting the burden of producing evidence that a person who suffers from chronic mental unsoundness characterized by delusions or hallucinations, including, but not limited to, delusions of persecution or grandeur, where this unsoundness affects his or her choice of beneficiaries is of unsound mind." (Sen. Bill No. 421, (1985-1986 Reg. Sess.) § 1.) On July 2, 1985, while in the Assembly, the bill was amended so that the original proposal was deleted in its entirety and new provisions were substituted. The amended version of the bill included provisions nearly identical to those ultimately enacted as section 6100.5.

Contrary to the claims set forth by Charles, the language and legislative history of section 6100.5 demonstrate that the statute was intended to closely adhere to the common law decisions as it pertained to testamentary capacity. This is reflected in the reports of three legislative committees. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 421 (1985-1986 Reg. Sess.) as amended July 2, 1985; Assem. Office of Research, 3d reading analysis of Sen. Bill No. 421 (1985-1986 Reg. Sess.) as amended Aug. 20, 1985; Sen. Rules Com., Office of Sen. Floor Analyses, Unfinished Business, Analysis of Sen. Bill No. 421 (1985-1986 Reg. Sess.) as amended Aug. 20, 1985.) The reports state clearly: "The purpose of this bill is to codify the standards for determining lack of testamentary capacity contained in *Estate of Perkins* (1925) 195 Cal. 699 [235 P. 45], and subsequent decisions."

*Perkins* established: "Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done." (*Estate of Perkins, supra,* 195 Cal. at pp. 703-704.) Neither is a mistaken belief necessarily a delusion. (*Id.,* at p. 709.) These principles were cited in both the *Shay* and *Struve* cases cited in the statement of decision at issue. (See *Estate of Shay, supra,* 196 Cal. at p. 361; *Estate of Struve, supra,* 100 Cal.App. at p. 260.) The trial court did not err in this regard. The fact that *Perkins* uses the term "insanity," whereas the modern trend may be away from categorizing persons with delusions and hallucinations in that manner, does not indicate a change in the law. In both *Perkins* and section 6100.5, subdivision (a)(2), the test is to determine whether a person suffers from delusions and hallucinations which result in the person dividing property in a way, except for the delusions and hallucinations, he or she would not have done. The designation that is given to the test is not the controlling factor.

Neither is there merit in Charles's contention that even if the trial court applied the correct legal standard under section 6100.5, subdivision

(a)(2), substantial evidence does not support the judgment. In our review for substantial evidence, we look at the evidence in support of the successful party, disregarding the contrary showing. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].) All conflicts in the evidence are resolved in favor of the respondent. All legitimate and reasonable inferences are indulged in order to uphold the verdict if possible. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) Moreover, as the trial court noted correctly, Charles had the burden of proving Edward was delusional at the time of executing the will. (See *Estate of Mann* (1986) 184 Cal.App.3d 593, 602, 606 [229 Cal.Rptr. 225].)

The trial court's finding that Edward was not delusional is supported by an abundance of competent evidence. First, evidence supported Edward's belief that Charles mistreated his sisters. There was evidence that Charles treated Joan poorly, especially during the 1986 Hawaii family vacation intended to be a reconciliation trip and that the mistreatment upset Edward. Second, the evidence established Edward was not delusional in his criticism of Charles's management of the business. Edward criticized Charles for not surrounding himself with good people, for spending time on personal affairs when he should have concentrated on business, for using a GLC employee, on company payroll, to maintain his boat, and for his inability to delegate authority. There is also evidence in the record that Edward was dissatisfied with the fact that Charles did not provide notice to all partners of partnership meetings and that Charles's bonuses were not subject to the approval of all partners. Evidence in the record supported Edward's beliefs.

Moreover, applying the statute and case law, the trial court properly concluded Charles failed to prove that the alleged delusion caused Edward to devise his property in a way which he would not otherwise have done. Substantial evidence supports the trial court's finding that Charles did not prove this causation element. The record reveals that Edward specified to Hudner and Montgomery several reasons for leaving Charles fewer assets than his sisters. Edward reasoned that he had a strained relationship with his son; that Charles already had a 40 percent share of the company and took 40 percent of the profits, a share twice as large as that of each sister; that Charles received a $1 million salary, plus bonus; and that Charles and his children had been given substantial interests in real estate. Edward believed he had already treated Charles very well. He thought his son led an affluent life-style and let money go to his head. Thus, apart from his beliefs about Charles's mistreatment of his sisters or his management skills, Edward had reasons why he wanted his son to receive a disproportionate share of the estate.

That Edward was not suffering from any delusions when he executed the will is buttressed by the fact that the May 22, 1990, will, prior to the hiring

of Hudner as counsel, reflected basically the same disposition with respect to the three children.

## III, IV*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The judgment is affirmed both as to the appeal and the cross-appeal. Joan and Gloria are awarded their costs on appeal.

White, P. J., and Chin, J., concurred.

A petition for a rehearing was denied July 15, 1994, and the petition of appellant Charles Goodman for review by the Supreme Court was denied September 7, 1994. George, J., did not participate therein.

---

*See footnote, *ante,* page 1667.