Filed 9/16/24 Certified for Publication 10/4/24 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B328439 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA487402) |
| v. | |
| ROMEO DEONTE KNOWLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge. Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant and defendant Romeo Deonte Knowles attacked a worker at a homeless shelter causing the victim to fall, hit his head, and perish. Knowles pleaded guilty to voluntary manslaughter and the court sentenced him to the midterm of six years' imprisonment. Knowles now appeals, arguing the court erred by not sentencing him to the low term of three years. We find no abuse of discretion, and affirm the sentence imposed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Offense Conduct[1]

On April 28, 2020, Knowles was 23 years old and unhoused. He resided at Midnight Mission, which provides services including shelter for homeless persons. Around midnight, a 53-year-old security guard at the facility named William Bullock was performing bunk checks. According to another resident, Knowles approached to show Bullock an object Knowles was holding. Evidence obtained after the fact suggested that Knowles was holding a broken knife handle. Bullock looked at what Knowles was holding, and Knowles then swung at Bullock and punched him in the head three to four times. Bullock backed away, lost his footing, and fell to the ground. Bullock hit his head as he fell; he began bleeding and became nonresponsive. He was transported to the hospital and later died of his injuries. The medical examiner determined the cause of death to be blunt force trauma to the head.

---

[1] The parties stipulated to the preliminary hearing transcript, the probation report, and the discovery in the case (including the police report) as the factual basis for the plea. We base our factual summary on these stipulated sources.

After his arrest, Knowles claimed Bullock had been intimidating him and that Knowles had been defending himself. According to another resident, Bullock had a reputation with some Midnight Mission residents for "push[ing] his authority around," although that resident never personally witnessed any such thing. That resident found Bullock to be strict but had a good relationship with him.

## B. Charges and Plea

An information filed on April 15, 2021, charged Knowles with murder (§ 187, subd. (a); count 1). The information was amended on July 11, 2022, to add a second count alleging voluntary manslaughter (§ 192, subd. (a); count 2). Knowles pleaded no contest to count 2, and the court later dismissed count 1.

## C. Sentencing

Prior to sentencing, the court received a mitigation packet from Knowles, a diagnostic report from the Department of Corrections and Rehabilitation (CDCR), and sentencing memoranda from both the prosecutor and defense counsel.

### 1. *Mitigation Packet*

The mitigation packet included a letter from defense counsel expressing deep remorse on behalf of Knowles for his conduct. It also contained two psychological assessments, dated February 12 and 15, 2021. The packet included evidence that when Knowles was seven years old, his father was shot and killed in a case of mistaken identity. Knowles was sexually abused by a schoolteacher, who was subsequently prosecuted. Knowles was also bullied and harassed in school. Knowles was hospitalized at the age of 20 or 21 after experiencing hallucinations, and was

3

diagnosed with either schizophrenia or thought spectrum/mood disorder. The day Bullock died, Knowles self-admitted to a hospital and was diagnosed with schizoaffective disorder.

Dr. Kevin Booker examined Knowles and opined that Knowles "appear[ed]" to have been suffering from schizoaffective disorder since adolescence or early adulthood, and that his untreated disorder had "likely impaired his . . . executive decision-making at the time" of the offense. Dr. Booker stated that individuals diagnosed with schizophrenia "may be prone to impulsive," "disinhibited behavior" and generally exhibited "unwary, disorganized, and negligent behavior." (Italics omitted.) Dr. Booker also opined, however, that Knowles's personality type was consistent with "generally responsible, socially acceptable, adult behavior," with no impulsive traits or antisocial tendencies, and that there was no overt evidence of "delusions, hallucinations, or bizarre thinking" at the time of examination.

Dr. Haig J. Kojian also examined Knowles. He listed "disturbances of perception, disturbed affect," and "withdrawing from reality" as behaviors associated with schizophrenia. Dr. Kojian similarly reported that at the time of examination Knowles exhibited clear thinking, and "[t]here was no acute evidence of psychosis." Dr. Kojian also opined that Knowles can become "quite disorganized and psychotic at times especially when not treated with medication" and that Knowles stated "he hadn't been taking his medication for a number of months before the incident."

2. *Diagnostic Report*

CDCR's diagnostic report included a psychological evaluation dated September 21, 2022. Knowles told the clinical social worker that he was hospitalized at the age of 19 and

4

diagnosed with paranoid schizophrenia. Upon being discharged, he continued treatment until the date of his arrest. Knowles reported no suicidal ideation or hallucinations, and the social worker observed none. When asked about the circumstances of Bullock's death, Knowles claimed that Bullock had continually "picked on" Knowles for no reason. Knowles asserted that Bullock had grabbed him very hard and told him to get out. Knowles then pushed Bullock, got scared, and fled. The social worker noted that Knowles was six feet two inches tall and weighed 270 pounds. Knowles said he was "sorry that this happened," that "I think about it every day," and that "[i]t really hurts me that someone died because of my actions."

In statements to correctional counselors, Knowles claimed that Bullock had sexually harassed and verbally insulted him. Knowles claimed Bullock grabbed him and raised a fist to strike at him. Knowles then punched Bullock once and ran out. Knowles denied repeatedly hitting Bullock.

CDCR also reported that on October 4, 2021, while in custody, Knowles had approached another inmate, after which Knowles and others attacked and punched the inmate. Knowles denied hitting the victim and claimed he intervened to break up an altercation. Video footage supported the victim's version of events, which was that Knowles attacked him, and Knowles received a disciplinary write-up and loss of privileges for two weeks.

Both the social worker and the correctional counselors opined that Knowles was a poor candidate for probation because he had minimized his role in Bullock's death, including failing to admit he had punched Bullock, and because his conduct while in custody showed he presented a significant risk to society.

3. *Sentencing Memoranda*

Knowles's sentencing memorandum expressed remorse and requested that the court impose the low term because of his age, his suffering of psychological and childhood trauma, his lack of a prior criminal record, and his low risk of recidivism. Knowles said Bullock " 'had a reputation of picking on new residents at the facility,' " and argued his past trauma and mental illness "distorted his perception of Mr. Bullock's conduct and his need to act in response to it."

The prosecution's sentencing memorandum reminded the court of its general discretion to impose a term not in excess of the midterm (§ 1170, subd. (b)(1)), the applicability of the low term presumption in light of Knowles's past trauma and youth (*id.*, subd. (b)(6)), and that the low term presumption did not apply where the aggravating circumstances outweigh the mitigating circumstances such that imposition of the low term would not serve the interests of justice (*ibid.*). The prosecution requested that the court sentence Knowles to the midterm because Bullock had not acted aggressively toward Knowles, and Knowles had failed to take responsibility for his actions.

4. *The Court Imposes Sentence*

On January 12, 2023, the court sentenced Knowles to serve the midterm of 6 years imprisonment. The court found the midterm sentence "in the interest of justice [because] the aggravating factors do outweigh the mitigating factors." The court identified the aggravating factors as the victim's vulnerability, Knowles's disciplinary writeup while in custody, and that Knowles had repeatedly minimized his involvement in Bullock's death. The court found the mitigating factors to be Knowles's age at the time of the offense and his lack of a criminal

record.  In response to defense counsel's claim that the court failed to engage with additional mitigating factors such as Knowles's childhood trauma, the court stated, "I do believe in looking at the entirety of the record, in my view the aggravating factors which I have stated are the appropriate factors in this case."

## DISCUSSION

Knowles contends the court abused its discretion in not sentencing him to the low term of three years imprisonment.  He argues the court misunderstood the scope of its sentencing discretion, disregarded substantial mitigating evidence triggering the low term presumption, and otherwise abused its discretion in imposing a midterm sentence.

### A.    Applicable Law

#### 1.    *Standard of Review*

We review discretionary sentencing decisions for abuse of discretion.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  A court abuses its sentencing discretion when it acts arbitrarily and capriciously, relies on improper matter in reaching its decision, or is unaware of the scope of its discretion so that it does not exercise informed discretion at all.  (*People v. Panozo* (2021) 59 Cal.App.5th 825, 837.)  Exercises of sentencing discretion must be "consistent with the letter and spirit of the law."  (*People v. Sandoval, supra*, at p. 847.)  " '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' "  (*Ibid.*, quoting *People v. Russel* (1968) 69 Cal.2d 187, 195.)

We presume that the trial court acted to achieve legitimate sentencing objectives. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978.) The burden is on the party challenging the sentencing decision to show that the court abused its discretion. (*People v. Lee* (2017) 16 Cal.App.5th 861, 866.) We may not presume error from a silent record. (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) "Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules." (*People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322; see also Cal. Rules of Court, rule 4.409 [all relevant sentencing factors "will be deemed to have been considered unless the record affirmatively demonstrates otherwise"].)

### 2. *Section 1170, Subdivision (b)(6)*

As applicable here, section 1170, subdivision (b)(6) creates a presumption that the court should impose the low term "if any of the following was a contributing factor in the commission of the offense: [¶] (A) The [defendant] has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth [meaning under the age of 26 years of age] . . . at the time of the commission of the offense." This presumption may be overcome if the court "finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice." (*Ibid.*) As made plain by the statutory text, the mere fact a defendant is young or has suffered past trauma is insufficient—either or both must be "a contributing factor in the commission of the offense" for the low

term presumption to apply.  (*Ibid*.; see also *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 991.)

**B.**     **The Court Did Not Misunderstand the Scope of its Sentencing Discretion**

Knowles argues that we should reverse because the court applied the wrong standard to its weighing of aggravating and mitigating circumstances.  According to Knowles, the low term presumption in section 1170, subdivision (b)(6) "cannot be overcome just because aggravating circumstances outweigh mitigating circumstances."  He claims we should read the statutory requirement that the court must "find[] that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice" (§ 1170, subd. (b)(6)) as meaning the aggravating circumstances must so outweigh the mitigating circumstances that a low term sentence would be " 'irrational' or 'indefensible.' "  Knowles asserts that unless we give the statute this construction, the low term "presumption would be meaningless, and the phrase 'contrary to the interests of justice' would be surplusage."

We disagree.  Knowles seeks to re-write the statute.  Section 1170, subdivision (b)(6) plainly states that the court may sentence above the low term if the aggravating circumstances "outweigh the mitigating" ones such that "imposition of the lower term would be contrary to the interests of justice."  This language is unambiguous.  We therefore " 'presume that the Legislature meant what it said, and the plain meaning of the statute controls. [Citations.]' " (*People v. Gray* (2014) 58 Cal.4th 901, 906.)  The statute does not say, and does not require, imposition of a low term sentence in every circumstance except those where it would

9

be "irrational or indefensible." Nor does the statute require the aggravating factors not just outweigh the mitigating factors but also outweigh them by some undefined additional quantum of proof. The record here shows the court correctly understood the scope of its sentencing discretion under section 1170, subdivision (b)(6).

We find unpersuasive Knowles's reliance on our Supreme Court's recent decision in *People v. Walker* (2024) 16 Cal.5th 1024 to support his proffered construction of section 1170, subdivision (b)(6). *Walker* interpreted a different statute—section 1385, subdivision (c)(2)—that requires courts considering whether dismissal of a sentencing enhancement is in the interest of justice to "afford great weight to evidence offered by the defendant" concerning certain specified factors (which include the current offense being connected to mental illness, prior victimization, or childhood trauma (§ 1385, subd. (c)(2)(D-E)), and that proof of such factors "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (*Id.*, subd. (c)(2).) *Walker* held this language did not create a presumption in favor of dismissing an enhancement when specified mitigating factors are proven. (*People v. Walker*, *supra*, at p. 1029.) Instead, "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that it assigns significant value to the enumerated mitigating circumstances when they are present." (*Ibid.*)

Knowles asserts section 1385, subdivision (c)(2) is in pari materia with section 1170, subdivision (b)(6). He claims we should import section 1385, subdivision (c)(2)'s language (as construed by *Walker*) regarding mitigating factors having great

10

weight in the enhancement context into section 1170, subdivision (b)(6)'s requirement that to exceed the midterm "aggravating circumstances [must] outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice." (*Ibid.*)  Put differently, Knowles asserts *Walker* suggests we construe the presence of a factor identified in section 1170, subdivision (b)(6) as strongly favoring the low term, and that a court may not find the low term presumption rebutted unless it finds aggravating circumstances that " 'neutralize even the great weight of the mitigating circumstance.' " (*People v. Walker*, *supra*, 16 Cal.5th at p. 1029.)

"[D]ifferent statutes should be construed together only if they stand in pari materia." (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4.)  The phrase "in pari materia" means " '[o]f the same matter; on the same subject.' " (*Altaville Drug Store, Inc. v. Employment Development Department* (1988) 44 Cal.3d 231, 236, fn. 4.)  " 'Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s] [or] things, or have the same purpose or object. Characterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other.  It has been held that where the same subject is treated in several acts having different objects the statutes are not in pari materia.  "The adventitious occurrence of . . . similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule." ' [Citation.]" (*Walker v. Superior Court*, *supra*, at p. 124, fn. 4.)

11

Although at a high level of generality the subject matter of both statutes involves sentencing, sections 1385 and 1170 are not in pari materia because they do not have the same object or purpose and were enacted for different ends. One governs the dismissal of enhancements, the other which level of a sentencing triad will be imposed. Further, the two statutes take very different approaches to their distinct objects and purposes. Both list specific mitigating factors; those lists have some overlap but also meaningful differences. Section 1385, subdivision (c)(2) contains a number of mitigating factors not listed in section 1170, subdivision (b)(6). Even where they overlap there are differences. For example, for age to be a mitigating factor under section 1385, subdivision (c)(2) the defendant must have been "a juvenile when they committed the current offense or any prior offenses . . . that trigger the enhancement or enhancements applied in the current case." (*Id*., subd. (c)(2)(G).) Under section 1170, subdivision (b)(6) the defendant need only be under the age of 26 "at the time of the commission of the offense." (*Id*., subd. (b)(6)(B).)

Section 1385, subdivision (c)(2) lists numerous factors a defendant can demonstrate without regard to their connection to the current offense (for example, that multiple enhancements are alleged, that application of an enhancement could result in a sentence of over 20 years, and the enhancement being based on a prior conviction over five years old). (*Id*., subd. (c)(2)(B), (C), (H).) Section 1170, subdivision (b)(6) in contrast requires that the low term presumption applies only when the identified factor "was a contributing factor in the commission of the offense." Section 1385, subdivision (c)(2) has no presumption in favor of dismissing an enhancement and requires the court to give "great weight" to the specified factors. Section 1170, subdivision (b)(6) does the

opposite: it creates a presumption in favor of the low term and does not contain any language requiring the court to give great weight to mitigating factors when weighing them against aggravating circumstances.

When statutes are in pari materia, they are construed together as one statute. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468.) But when two statutes are not in pari materia, which given their myriad differences sections 1170 and 1385 are not, we do not construe their unrelated provisions together. Furthermore, the in pari materia "rule of statutory construction does not mean . . . that one statutory definition may be ignored and replaced by a different one." (*People v. Honig* (1996) 48 Cal.App.4th 289, 328.) We decline to read into the statutory language of section 1170, subdivision (b)(6) terms that it does not contain in its explanation of how the court is to weigh aggravating and mitigating circumstances from an unrelated statute governing the dismissal of enhancements that lacks a similar presumption and provides a different procedure for weighing aggravating and mitigating circumstances.

## C. The Court Did Not Improperly Fail to Consider Mitigating Evidence

Knowles next argues we should remand for resentencing because the court failed to consider relevant mitigating evidence. It is true the court did not mention all of the mitigating evidence, including Knowles's childhood trauma, during the sentencing hearing. We presume, however, that the court properly considered such evidence "unless the record affirmatively reflects otherwise." (Cal. Rules of Court, rule 4.409.) Knowles argues the record here does affirmatively reflect otherwise. We disagree.

13

Knowles first points out that when his counsel objected that the defense sentencing memorandum contained "many more mitigating factors" beyond those identified by the court, the court responded that in its view "looking at the entirety of the record, in my view the aggravating factors which I have stated are the appropriate factors in this case." Knowles interprets this as the trial court stating it could disregard some of the statutory factors triggering the low term presumption. We reject this strained interpretation. The more reasonable reading is that the court was not convinced those additional claimed mitigating factors contributed to the assault that ended in Bullock's death. For example, the trial court could have reasonably inferred that Knowles's mental illness did not contribute to his offense. Drs. Kojian and Booker found no indication that Knowles was antisocial or impulsive, or that he was suffering from psychosis or any hallucinations.[2] Neither Dr. Kojian nor Dr. Booker explained how the impacts of Knowles's childhood trauma contributed to his planning and execution of the assault on Bullock. Knowles himself justified his attack by claiming Bullock had picked on him and raised a fist to strike Knowles, and that Knowles simply

[2] The closest either came was Dr. Booker's statement that Knowles's "moderate psychiatric mood disorder . . . likely impaired his global functioning, to include his executive decision-making at the time he became involved in the current case" and that Knowles's condition "can, at times, impair his insight and decision-making abilities." These statements were sufficiently qualified and vague that the court could reasonably find they did not show Knowles's psychological condition contributed to his repeated punching of Bullock, especially in light of Knowles's later statements attempting to justify his actions based on Bullock's purported actions and not on his psychological state.

14

pushed him and fled. Those explanations did not suggest prior trauma or psychological conditions contributed to Knowles's actions, and were also (as the court found in aggravation) contrary to evidence that Knowles's attack was unprovoked and that he repeatedly punched Bullock.

Knowles next points to the court's statements to the families of Knowles and Bullock at the beginning of the sentencing hearing that "[t]here is nothing I am going to say or do in the next few moments that will make your life any easier. I feel very much for your loss." Addressing Bullock's family in particular, the court then said, "If I were to impose the most severe sentence I could possibly think of, that wouldn't bring your love[d] one back. It seems like he was a very great man and I am very sorry. It is my job to impose the law. I am constrained by what the law is. I have to look at the aggravating and the mitigating factors on both sides and come up with what I believe is a fair judgment based on the law. I can pretty much tell the Bullock family the sentence I am going to impose is not a sentence that will make you happy. The law simply doesn't allow me to give a sentence which would make you happy or satisfied."

Knowles claims this statement shows the court did not want to sentence him to the low term even though the law required it, and the court therefore disregarded the applicable law because it felt that voluntary manslaughter has an unreasonably low mitigated term. We find this interpretation unsupported. The court did not say it would not follow the law. It expressly stated to the contrary, and conveyed to the victim's family that, regardless of whether it imposed the low term or the midterm, it understood the family might consider the sentence imposed insufficient given their loss. We decline to read this

gesture of sympathy towards a grieving family as a sub rosa statement that the court would disregard the applicable law.

## D. The Court Did Not Otherwise Abuse its Discretion in Sentencing Knowles

Knowles lastly claims the court abused its discretion in how it weighed the aggravating and mitigating circumstances before it. Weighing those circumstances is the province of the trial court. We may not reverse a sentencing decision " 'merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*People v. Superior Court (Alvarez), supra,* 14 Cal.4th at p. 978.) The court's analysis here of the evidence before it along with the applicable sentencing factors was neither irrational nor arbitrary, and we therefore will not disturb it.

## DISPOSITION

The judgment of conviction is affirmed.


WEINGART, J.

We concur:


BENDIX, Acting P. J.          KELLEY, J.[*]

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16

Filed 10/4/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B328439 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA487402) |
| v. | |
| ROMEO DEONTE KNOWLES, | ORDER CERTIFYING FOR PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on September 16, 2024, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

WEINGART, J.        BENDIX, Acting P. J.        KELLEY, J.[*]

_____

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.